UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| TIM WILLIAMS, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>vs.<br><br>ELLIS YAN, TCP INTERNATIONAL HOLDINGS LTD., SOLOMON YAN, BRIAN CATLETT, MATTHIAS BELZ, JURGEN BORGT, DEUTSCHE BANK SECURITIES INC., PIPER JAFFRAY & CO., CANACCORD GENUITY INC., AND COWEN AND COMPANY, LLC,<br><br>               Defendants. | No. 1:15-cv-398<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

| | |
|---|---|
| LANDSKRONER GRIECO<br>  MERRIMAN LLC<br>JACK LANDSKRONER<br>1360 West 9th Street, Suite 200<br>Cleveland, OH  44113<br>Telephone:  216/522-9000 | ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>DARREN J. ROBBINS<br>DAVID WALTON<br>655 West Broadway, Suite 1900<br>San Diego, CA  92101<br>Telephone:  619/231-1058 |
| ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>JACK REISE<br>ROBERT J. ROBBINS<br>120 East Palmetto Park Road, Suite 500<br>Boca Raton, FL  33432<br>Telephone:  561/750-3000 | JOHNSON & WEAVER, LLP<br>FRANK J. JOHNSON<br>600 West Broadway, Suite 1540<br>San Diego, California  92101<br>Telephone: 619-814-4471 |

Plaintiff Tim Williams ("Plaintiff") makes the following allegations based upon the investigation undertaken by his counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by TCP International Holdings Ltd. ("TCP" or the "Company"), as well as securities analysts' reports, advisories, press releases, media reports, and other public statements issued about or by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of those who purchased TCP common stock in and/or traceable to the Company's initial public offering (the "Class") on or about June 26, 2014 (the "IPO") seeking to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.

3. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

4. Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District, Defendant Ellis Yan resides in this District, and the Company operates in this District.

5. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE").

**PARTIES**

6. Plaintiff purchased TCP common stock, as set forth in the certification attached hereto and incorporated herein by reference, traceable to the IPO and was damaged thereby.

7. Defendant Ellis Yan is, and was at the time of the IPO, the Chief Executive Officer of TCP, Chairman of the Board, and a Director of the Company.

8. Defendant TCP International Holdings Ltd. designs, develops, manufactures, and delivers energy efficient lamps, fixtures and internet-based lighting control solutions. The Company states that it has "established the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined" and claims that its products are Underwriters Laboratory ("UL") certified.

9. Defendant Solomon Yan is, and was at the time of the IPO, the President, Vice-Chairman, and a Director of the Company. Solomon Yan is Ellis Yan's brother.

10. Defendant Brian Catlett is, and was at the time of the IPO, the Chief Financial Officer and Treasurer of the Company.

11. Defendants Matthias Belz and Jurgen Borgt are, and were at the time of the IPO, Directors of the Company.

12. The Defendants named in ¶¶7, 9-11 are collectively referred to herein as the "Individual Defendants." The Individual Defendants signed the Registration Statement issued in connection with the IPO ("Registration Statement").

13. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank located in New York, New York that offers securities brokerage and investment advisory services to both domestic and international private clients and institutions and correspondent clearing services to broker-dealers. Deutsche Bank acted as an underwriter of TCP's IPO, helping to draft and disseminate the offering documents.

14. Defendant Piper Jaffray & Co. ("Piper Jaffray") is an investment bank and asset management firm located in Minneapolis, Minnesota that offers financial advisory and security brokerage services. Piper Jaffray acted as an underwriter of TCP's IPO, helping to draft and disseminate the offering documents.

15. Defendant Canaccord Genuity Inc. ("Canaccord") is a global, full service investment bank focused on growth companies, with operations in ten countries worldwide. Canaccord acted as an underwriter of TCP's IPO, helping to draft and disseminate the offering documents.

16. Defendant Cowen and Company, LLC ("Cowen") is a diversified financial services firm that provides investment management, investment banking, research, and sales and trading services. Cowen acted as an underwriter of TCP's IPO, helping to draft and disseminate the offering documents.

17. The Defendants named in ¶¶13-16 are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and collectively received discounts and commissions of approximately $5.5 million in connection with the IPO.

18. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly, accurately, and free from misstatements or omissions of material fact. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

19. TCP, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all those who purchased TCP common stock in and/or traceable to the IPO. Excluded from the Class are Defendants named herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

21. The members of the Class are so numerous that joinder of all members is impracticable. TCP issued 7.14 million shares in the IPO. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TCP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

23. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

25. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged herein violated the Securities Act;

(b) whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

**SUBSTANTIVE ALLEGATIONS**

26. TCP holds itself out as a leading global provider of energy efficient LED and CFL lighting technologies. TCP represents that it designs, develops, manufactures, and delivers "high quality energy efficient lamps, fixtures and internet-based lighting control solutions." The Company describes itself as having a "broad portfolio of advanced LED and CFL lamps and fixtures" that enables it to "address a wide range of applications required by [its] retail and commercial and industrial ("C&I") customers."

27. Importantly, TCP describes itself as having "established the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined." The Company sells the majority of its products in the United States and Canada.

28. The Company operates product development facilities in Aurora, Ohio, and Shanghai, China. TCP states that these product development facilities are "focused on introducing new technologies, increasing functionality, enhancing quality, improving manufacturing processes and reducing costs."

29. On May 21, 2014, TCP filed a draft Registration Statement on Form S-1 with the SEC. On June 25, 2014, following several amendments, the SEC declared the Registration Statement effective, pursuant to which the Company sold 7,142,858 shares for $11.00 each. In connection with the IPO, the Company granted the underwriters a 30-day option to purchase up to an additional 1,071,428 common shares at the IPO price less underwriting discounts and commissions.

30. On June 26, 2014, TCP common stock was listed and began trading on the NYSE under the trading symbol "TCPI."

31. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material information required pursuant to the regulations governing the preparation of the Registration Statement. Specifically, the Registration Statement failed to disclose that the Company was producing products and labelling the products as UL and Energy Star approved when no such approvals had been received. UL and Energy Star approvals are critically important to lighting manufacturers.

32. UL is an American worldwide safety consulting and certification company that participates in the safety analysis of many new technologies and the drafting of safety standards for electrical devices and components. UL provides safety-related certification, validation, testing, inspection, auditing, advising, and training services to a wide range of clients, including

manufacturers, retailers, policymakers, regulators, service companies, and consumers. In order to receive UL approval, a product must be submitted to UL and tested and approved by UL. Once approved, the product is provided a unique UL number and able to be labelled UL approved. Architects and builders will require that products have UL certification in order to be specified for construction projects. In other words, if a product is not UL approved, the market for that product is extremely limited.

33. Energy Star is an international standard for energy efficient consumer products originated in the United States. Devices carrying the Energy Star service mark, such as computer products and peripherals, kitchen appliances, buildings, and other products, generally use 20–30% less energy than required by federal standards. The Energy Star designation is a significant feature for the Company's products, and it helps qualify those products for rebates provided by utility companies throughout the United States. The Energy Star designation cannot be placed on any product without prior approval from Energy Star.

34. The Registration Statement included a description of TCP's business as a leading global provider of energy efficient LED and CFL lighting, and described the Company as having the largest number of Energy Star compliant lighting products for LEDs and CFLs combined. The Registration Statement also described the Company's vertically integrated manufacturing process as a strategic advantage that allowed the Company to exercise unique control over product quality and stated that "[s]ubstantially all of [the Company's] products are manufactured in [its] four facilities in China." For example, the Registration Statement stated, in pertinent part:

> ***We have received numerous awards for our products, including being named an ENERGY STAR® Partner of the Year in 2013 and 2014***. We also received the Envisioneering Innovation and Design Award at the Consumer Electronics Show in 2014 for our Connected by TCP™ internet-based lighting control solution. For our LED lamps, we develop our own design specifications and source components from world-class suppliers, such as Nichia, NXP Semiconductors, Texas Instruments and Seoul Semiconductor, which enables us to remain technologically agnostic with the flexibility to adopt advancements in LED technology and leverage the LED chip

manufacturers' R&D.  *Unlike many of our competitors, we utilize a vertically integrated, efficient and automated process to manufacture our CFL products at four facilities in China.  This allows us to maintain control over product quality, react quickly to our customers' specifications, achieve faster product introductions and maximize our margins*.

\*   \*   \*

*We believe our manufacturing operations provide us with a key competitive advantage in the market.  We deploy advanced and highly automated manufacturing processes at all of our facilities.  In addition, our facilities are integrated, resulting in substantial benefits in efficiency, production management and cost controls*.

35. Further describing the Company's Energy Star compliance, the Registration Statement stated, in pertinent part:

Once the designs are complete, we test these products in our EPA recognized photometry labs for ENERGY STAR® qualification.  We have accredited labs in both US and China facilities.  *We are committed to the ENERGY STAR® program as it maximizes our sales opportunities due to the many rebates offered for ENERGY STAR® qualified LED products. We have established the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined. We also have an accredited UL lab in which we can validate and ensure the safety of our global products*.

\*   \*   \*

*We have the leading number of ENERGY STAR® compliant CFL lamps. . . . Our CFL technologies are available in the majority of our CFL product lines*, including SpringLamps, A lamps, globes, and parabolic aluminized reflectors, or PARs.  *Our CFLs have been honored across the industry with several awards*. Our notable awards and achievements include:

- *we were recognized by ENERGY STAR® as Partner of the Year in 2013 and 2014, with substantially all of our CFLs meeting or exceeding ENERGY STAR® requirements*;

- our TruDim® lamps were recognized by the Illuminating Engineering Society for unique and significant advancement in lighting technology; and

- our TruStart® lamps were recognized by LightFair 2011 for innovation in the CFL subcategory.

*We believe our CFL technology is a differentiating factor in the market and we continue to make improvements and add features to our products to maintain our competitive position*.

- 8 -

36. Discussing quality assurance and control, the Registration Statement stated, in pertinent part:

> In order to ensure the consistent quality of our products, *we apply our quality control procedures at each stage of our manufacturing process, ranging from inspection of raw materials through production and delivery*. We ensure that all raw materials, components, and finished products fulfill quality control requirements and standards. The following is a summary of our quality control procedures by stage of the manufacturing process:
>
> - Raw Materials—All raw materials and supplies are subject to sample inspections upon arrival. In addition, our team makes regular and unannounced visits to raw material suppliers to ensure we have an in-depth understanding of our suppliers' quality.
>
> - Semi-Finished Products—We conduct quality control tests at different points during the various production stages of our manufacturing process to ensure that there is no loss of quality anywhere in the production of our products. Our testing methods include visual inspection, key specification and functional checks.
>
> - Finished Products—Our quality control staff administers tests on finished and packaged products to assess product safety, structural integrity, durability of packaging, conformity with design and color specification and accuracy of printed packaging materials.
>
> We are firmly committed to maintaining high-quality manufacturing and R&D facilities. The majority of our manufacturing plants are certified by the International Organization for Standardization, or ISO, and two of our R&D labs are accredited under ISO/IEC 17025:2005. *Our commitment to quality assurance and control throughout every stage of the production of our lamps is a critical underlying component of our ability to deliver the high quality products to our customers in a timely fashion*.
>
> \* \* \*
>
> *To help ensure that we produce high quality products, we employ quality-assurance measures to govern the design and development process*. We have established an Advanced Product Quality Planning process to test and analyze the quality of potential prototypes throughout the proof-of-concept, design and development, and validation and product launch stages. *Thorough reviews are held between each of the development stages to ensure that every product that reaches the market upholds the high quality standard set by our existing products. Additionally, our continual improvement program incorporates updated customer requirements and satisfaction reviews into our product quality data analysis to confirm the quality received by our customers and to respond to product issues in real time*.

- 9 -

37. The Registration Statement also described the Company as "well-positioned" to capitalize on the lighting market's rapidly growing LED opportunity, stating, in pertinent part:

> We believe that LED lighting solutions are at an inflection point, having become the fastest growing sector of the general lighting market due to light quality, appealing economics, government regulation, public awareness, and emerging connectivity and control capabilities. ***Our LED product portfolio is aligned to capitalize on this growth within the retail and C&I channels***. In addition, we have developed strong relationships with key customers, including Walmart. We also have secured new LED customers outside of the United States and Canada, including Homebase and Carrefour in EMEA, IRIS Ohyama, Inc. ("IRIS") and Emart in Asia and Sodimac in Latin America. As a result of these factors, from 2011 to 2013, our LED sales grew at a 208.0% CAGR. LED products are an increasing portion of our revenues, accounting for 4.3% of net sales in 2011, 25.0% of net sales in 2013 and 35.9% of net sales for the three months ended March 31, 2014.
>
> \*   \*   \*
>
> ***Our focus on product development enables us to provide a wide range of advanced lighting products to our customers in a timely fashion***. We operate product development facilities in Aurora, Ohio and Shanghai, China where we focus on new technologies, increasing functionality, enhancing quality, improving manufacturing processes and reducing costs. ***We believe that our rigorous product development and testing processes led to our receipt of ENERGY STAR® Partner of the Year awards in 2013 and 2014, among other awards***. We have developed driver technologies for our CFL products, including our patented TruDim® and TruStart® technologies. We have leveraged these existing technologies for our LED drivers, which has helped us achieve a high standard of efficiency.

38. Similarly, the Registration Statement described how the Company was positioned to implement several growth strategies, and stated, in pertinent part:

> Our goal is to be the global market leader in energy efficient lighting solutions. Our growth strategies include:
>
> Increase Our Sales of LED Products. Our LED portfolio consists of more than 750 SKUs that address a wide range of general lighting applications. In addition, ***we have a strong product roadmap to develop new LED products, including fixtures, high voltage lamps and smart lighting products, that we intend to introduce to the market in the near-term***. In recent years, we have established a C&I sales force to address catalog and electrical, specialty lighting and utility distributors as well as directly marketing to large hospitality and retail store end users, including Chipotle and Hilton. We believe that these efforts will enable us to benefit from the expanding global market for LED lighting technology. ***We intend to use the net proceeds from this offering in part to acquire and develop advanced, automated manufacturing equipment to expand our LED manufacturing capacity, which will***

- 10 -

*allow us to decrease our time-to-market and maintain our product technology and quality leadership*.

Develop the TCP Brand. *Our goal is for our customers and end-users to further associate the TCP brand with high quality lighting solutions that offer industry leading technology*. We have built strong brand awareness and customer recognition within the C&I channel. For the retail channel, we currently sell our products primarily under private label, whereby our retail customers then re-sell these products to consumers under their own brand names. Recently, we have begun introducing TCP-branded and co-branded products into our retail channel to increase TCP brand awareness with consumers. To further promote TCP brand awareness, we intend to use a targeted media campaign to leverage directed internet advertising and social media, as well as strategically placed in-store interactive video and displays. We believe that our smart lighting platform for the connected home and office will also increase brand recognition among consumers.

39.     The Registration Statement made numerous statements falsely describing the

Company's so-called portfolio of efficient lighting products stating, in pertinent part:

*Our high quality lighting solutions including lamps, indoor and outdoor fixtures and connected lighting products focus solely on the energy efficient lighting market. We have more than 750 LED SKUs and 2,500 CFL SKUs, which in 2013 together accounted for 92.4% of our net sales, as well as complementary lighting solutions that address specific customer needs*. Countries around the world are increasingly adopting standards to reduce the use of inefficient lighting technologies. *Our portfolio helps our end users meet these standards and reduce energy usage and costs without sacrificing light quality*. *Our products have received numerous awards, including ENERGY STAR® Partner of the Year awards in 2013 and 2014.*

*     *     *

*Our focus on product development enables us to provide a wide range of advanced lighting products to our customers in a timely fashion*. We operate product development facilities in Aurora, Ohio and Shanghai, China, *where we focus on new technologies, increasing functionality, enhancing quality, improving manufacturing processes and reducing costs*. *We believe that our rigorous product development and testing processes led to our receipt of ENERGY STAR® Partner of the Year awards in 2013 and 2014, among other awards*. We have developed driver technologies for our CFL products, including our patented TruDim® and TruStart® technologies. *We have leveraged these existing technologies for our LED drivers, which has helped us achieve a high standard of efficiency*.

*     *     *

The United States, EMEA, China, and other countries and regions in which we operate, have already instituted, or have announced plans to institute, government regulations and programs designed to encourage or mandate increased energy efficiency in lighting. *We believe our extensive portfolio of energy efficient*

- 11 -

*lighting products is well positioned to capitalize on this transition*. In particular, the rate and extent of adoption of higher margin LED lamps within the general lighting market will impact our future growth rates. The rate and extent of adoption of LED lamps will depend upon, among other things, end users' desire and ability to pay higher up-front costs for LED lamps compared to other alternative energy efficient lighting products. Innovations and advancements in LED lamp manufacturing technology that reduce up-front costs and improve performance will reduce the operating cost of the lamps, further enhancing the value proposition of these LED lamps compared to other alternative energy efficient lighting products. In addition, many utilities and governmental agencies provide financial incentives to reduce the growing demand for electricity, such as rebates for energy efficient lighting products that further reduce up-front costs to end-users and may accelerate the rate of adoption.

40. The statements referenced above in ¶¶34-39 were inaccurate statements of material fact because they failed to disclose that the Company was manufacturing lighting fixtures and labelling those products with UL and Energy Star approval when no such approvals had been received.

41. Under the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose that the Company was manufacturing lighting fixtures and labelling those products with UL and Energy Star approval when no such approvals had been received.

42. On February 27, 2015, TCP common stock closed at $3.02 per share, or approximately 75% less than the IPO price.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants

43. Plaintiff incorporates ¶¶1-42 by reference.

44. This Cause of Action is brought pursuant to Section 11 of the Securities Act on behalf of the Class, against all Defendants.

45. The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

46. Defendants are strictly liable to Plaintiff and the other members of the Class for the misstatements and omissions.

47. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

48. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

49. Plaintiff acquired TCP common stock traceable to the IPO.

50. Plaintiff and the other members of the Class have sustained damages. The value of TCP stock has declined substantially subsequent to and due to Defendants' violations.

51. At the time of their purchases of TCP stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the shares upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

52. Plaintiff incorporates ¶¶1-42 by reference.

53. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against all Defendants.

54. Defendants were sellers, offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus. Defendants issued, caused to be issued, and/or signed the Registration Statement. The Registration Statement contained a Prospectus that was used to induce investors, such as Plaintiff and the other members of the Class, to purchase TCP common stock.

55. The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus. The Company, acting through its employees, agents, and others, solicited such purchases for its personal financial gain through the preparation and dissemination of the Prospectus.

56. The Company, its employees and agents, and the Individual Defendants owed Plaintiff and the other members of the Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care by their employees and agents should have known, of the misstatements and omissions contained in the IPO materials, including the Prospectus, as set forth above.

57. Plaintiff and the other members of the Class purchased or otherwise acquired TCP common stock pursuant to and/or traceable to the defective Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

58. By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and the other members of the Class who hold TCP common stock purchased in the IPO have the right to rescind and recover the consideration paid for their TCP common stock and hereby elect to rescind and tender their TCP common stock to Defendants sued herein in return for the consideration paid for those securities together with interest thereon. Plaintiff and the other Class members who have sold their TCP common stock are entitled to rescissory damages.

## COUNT III

### For Violation of Section 15 of the Securities Act
### Against the Company and the Individual Defendants

59. Plaintiff incorporates ¶¶1-42 by reference.

60. This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Company and the Individual Defendants.

61. The Individual Defendants each were control persons of TCP by virtue of their positions as directors and/or senior officers of TCP. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of TCP. The Company controlled the Individual Defendants and all of TCP's employees.

62. The Individual Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

    B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

    D.    Awarding rescission or a rescissory measure of damages; and

    E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  March 2, 2015                           LANDSKRONER GRIECO MERRIMAN LLC
                                                    JACK LANDSKRONER

                                                    /s/ Jack Landskroner
                                                    JACK LANDSKRONER (0059227))
                                                    1360 West 9th Street, Suite 200
                                                    Cleveland, OH  44113
                                                    Telephone:  216/522-9000
                                                    216/522-9007 (fax)
                                                    E-mail: jack@lgmlegal.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
ROBERT J. ROBBINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3064 (fax)
E-mail: jreise@rgrdlaw.com
E-mail: rrobbins@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: darrenr@rgrdlaw.com
E-mail: davew@rgrdlaw.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, California 92101
Telephone: 619-814-4471
619/255-1856 (fax)
E-mail: FrankJ@johnsonandweaver.com

Attorneys for Plaintiff